**Virgil Leroy AIKINS,
Petitioner-Appellant,**

v.

**UNITED STATES of America,
Respondent-Appellee.**

**No. 74–2619.**

United States Court of Appeals,
Ninth Circuit.

Feb. 9, 1976.

Virgil L. Aikins, in pro. per.

William C. Smitherman, U.S. Atty., Tucson, Ariz., for respondent-appellee.

## OPINION

Before WRIGHT and CHOY, Circuit Judges, and EAST,* Senior District Judge.

EUGENE A. WRIGHT, Circuit Judge:

Petitioner presents the novel question whether the offense to which he pleaded guilty occurred within the territorial jurisdiction of the United States. The district court, after conducting an evidentiary hearing, determined that it had and denied petitioner's motion to vacate sentence pursuant to 28 U.S.C. § 2255. We affirm.

Petitioner was arrested at the Nogales, Arizona port of entry and charged with importation of heroin in violation of 21 U.S.C. § 174. After he pleaded guilty and was sentenced, petitioner challenged the jurisdiction of the court. In a previous appeal to this court, we ordered that the case be remanded to the district court for an evidentiary hearing to determine whether the offense was committed within the territorial jurisdiction of the United States. *Aikins v. United States*, 472 F.2d 1380 (9th Cir. 1973). Petitioner now appeals the district court's determination against him.

It is undisputed that the offense occurred at the United States primary inspection station located approximately thirty-five feet north of the presently monumented international boundary at Nogales. Difficulty arises because there is a disparity of approximately two hundred feet between the line as marked by monuments and the parallel of 31° 20′ north designated by the Gadsden Treaty of 1853 as the international boundary. In essence, petitioner contends that although the inspection station is located north of the line marked by the monuments, it is south of the line designated by the treaty and therefore outside the territorial jurisdiction of the United States.

The government admits that the disparity between the two lines exists but contends that the line marked by the monuments governs. A determination whether petitioner's offense was committed within the United States depends on which line represents the boundary between the two countries.

A proper reading of the Gadsden Treaty of 1853 supports the government's po-

---

* Honorable William G. East, Senior United States District Judge, District of Oregon, sitting by designation.

sition. After describing the parallel of 31° 20′ north as the boundary in the area of what is now Nogales, the treaty states:

[E]ach of the two governments shall nominate one commissioner . . . by common consent the two thus nominated . . . may proceed to survey and mark out upon the land the dividing line stipulated by this article . . . . [T]hat line shall be alone established upon which the commissioners may fix, their consent in this particular being considered decisive and an integral part of this treaty, without necessity of ulterior ratification or approval and without room for interpretation of any kind by either of the parties contracting.

The dividing line thus established shall, in all time, be faithfully respected by the two governments, without any variation therein, unless of the express and free consent of the two . . . .

Gadsden Treaty of 1853, Article I. [10 Stat. 1031; TS 208; 9 Bevans 812.]

The treaty's language clearly indicates that both countries intended to be bound by the line "mark[ed] out upon the land." Both countries agreed that the line fixed by the commissioners would be decisive and would become an integral part of the treaty. While the commissioners were required to follow the parallel set forth in the treaty as closely as possible, the parties apparently understood that technological problems and difficulties in the terrain might make exact measurement and demarcation impossible. The emphasis in the language of the treaty on acceptance of the line as marked by the commissioners indicates that this line, rather than the hypothetical parallel, marks the international boundary.[1]

This reading of the treaty also comports with means for resolving more traditional boundary disputes. In the context of a dispute between a private party and the United States, we said:

The wisdom of centuries of land law [is] to the effect that lines marked on the ground by monuments stand highest in the determination of the true boundaries of conveyed land, ranking above statements of directions, distances, or area . . . . .

*United States v. Weyerhaeuser Co.*, 392 F.2d 448, 451 (9th Cir. 1967).

To construe the treaty otherwise and accept petitioner's position would result in disruption of the affairs of both countries and the local inhabitants who have come to rely on the boundary as it was fixed by agreement more than a hundred years ago. Both the United States and Mexico agreed to the creation of the boundary as it now exists, neither has objected to it, and this court will not alter it.

The denial of petitioner's motion is Affirmed.

---

1. The boundary was resurveyed during the period 1891–96 by a joint commission of American and Mexican surveyors because some of the earlier monuments had either been destroyed or moved. During the course of this survey it was recognized that there had been some slight errors in the original survey. However, the joint commission concluded that because of the terms of the Gadsden Treaty the boundary as earlier established was final and could not be altered. Report of the Boundary Commission, 1891 to 1896 at 17–18.